

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | No. 08-20-00168-CR |
| Appellant, | § | Appeal from the |
| v. | § | County Court at Law No. 1 |
| GABRIELA QUIROZ MACEDO, | § | of Williamson County, Texas |
| Appellee. | § | (TC# 20-0505-CC1) |

## OPINION ON EN BANC RECONSIDERATION[1]

The State appeals the trial court's order granting the relief requested in Appellee Gabriela Quiroz Macedo's application for writ of habeas corpus, arguing the trial court abused its discretion in finding that: (1) Quiroz Macedo's counsel rendered ineffective assistance of counsel by failing to fully advise her of the immigration consequences of her guilty plea and she was prejudiced as a result; and (2) laches did not bar Quiroz Macedo's claim. Based on the law and the record before it, we conclude that the trial court did not abuse its discretion in determining Quiroz Macedo was entitled to habeas relief. Accordingly, we affirm.[2]

---

[1] We grant Appellee's motion for reconsideration en banc, withdraw our opinion and judgment of August 15, 2022, and substitute this opinion on en banc reconsideration. We deny Appellee's motion to stay ruling on motion for reconsideration en banc.

[2] This case was transferred from the Third Court of Appeals pursuant to the Texas Supreme Court's docket equalization efforts. *See* Tex. Gov't Code Ann. § 73.001. We follow the precedent of that court to the extent it conflicts with our own. *See* Tex. R. App. P. 41.3.

# I.  PROCEDURAL AND FACTUAL BACKGROUND

Quiroz Macedo was born in Mexico on September 23, 1992, and on an unknown date, while still a juvenile, she illegally crossed into the United States.[3] According to Quiroz Macedo, when she was eight years old and living in Austin, Texas, her parents left the United States, leaving her in the care of her then-19-year-old sister. As discussed below, in 2009 and 2010, while 17 years old, Quiroz Macedo pled guilty to two charges involving the possession, or attempted possession, of a controlled substance (alprazolam, a drug commonly known as Xanax). Though the 2009 conviction has since been dismissed, her 2010 conviction has resulted in removal proceedings, prompting her to file her application for a writ of habeas corpus, which is the subject of the current appeal.

## A.  The 2009 offense

In November 2009, pursuant to a plea bargain agreement and while represented by counsel, Quiroz Macedo entered a guilty plea to attempted possession of a controlled substance: alprazolam PG 1 <1g, a Class A misdemeanor in a Travis County district court. She was placed on deferred adjudication community supervision for 364 days starting December 18, 2009. The conditions of her community supervision included paying certain fees, performing 80 hours of community service, and not committing any additional offenses. The trial court certified that she had no right to appeal from the community supervision order.

At the time of her plea, Quiroz Macedo signed a document entitled, "Plea of Guilty, Admonishments, Voluntary Statements, Waivers, Stipulation & Judicial Confession." Quiroz

---

[3] These undisputed facts are drawn from an exhibit attached to the response the State filed in the trial court in its opposition to Quiroz Macedo's application for writ of habeas corpus. Specifically, a Form I213 was prepared and submitted by the U.S. Department of Homeland Security which stated "QUIROZ-Macedo, Gabriela (FEMALE/JUVENILE-DOB: 09/23/1992) is not a national or citizen of the United States. Subject is a native and citizen of Mexico, who acknowledges illegal entry by crossing the international boundary into the United States, on or about an unknown date . . . ."

Macedo initialed a space in the document indicating that she was not a citizen of the United States. Below this space, a warning stated: "If you are not a citizen of the United States of America, a plea of Guilty or nolo contendere may result in deportation, your exclusion from admission to this country, or your denial of naturalization under federal law."

Under state law, being placed on deferred adjudication community service is not considered a conviction, and instead, as the name suggests, it defers adjudication of the defendant's guilt. Tex. Code Crim. Proc. Ann. art. 42.12, § 2(2); *see also State v. Guerrero*, 400 S.W.3d 576, 587–88 (Tex. Crim. App. 2013) (recognizing that under State law, placement on deferred adjudication community supervision is not considered a conviction). Had Quiroz Macedo successfully completed the conditions of her deferred adjudication community supervision, she would have been entitled to have the charge dismissed and seek expungement. *See Tex. Dep't of Pub. Safety v. Nail*, 305 S.W.3d 673, 680–81 (Tex. App.—Austin 2010, no pet.) (citing Tex. Code Crim. Proc. Ann. art. 42.12 § 5(c)); *see also Guerrero*, 400 S.W.3d at 588 (recognizing that upon completion of deferred adjudication community supervision, the charge against the defendant is to be dismissed).

However, under federal immigration law, even if a defendant is placed on deferred adjudication community supervision and is never formally convicted under state law, a defendant's plea of guilty or nolo contendere to a controlled substance offense is itself considered a "conviction," subjecting the defendant to presumptively mandatory removal from the country. *Guerrero*, 400 S.W.3d at 588 (citing *Moosa v. I.N.S.,* 171 F.3d 994, 1001, 1006 (5th Cir. 1999); 8 U.S.C. § 1101(a)(48)(A));[4] *see also Padilla v. Kentucky*, 559 U.S. 356, 380 n.2 (2010) (Alito,

---

[4] Section 1101(48) provides in relevant part:

(A) The term 'conviction' means, with respect to an alien, a formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where—(i) a judge or jury has found the alien guilty or the alien has

J. concurring) (recognizing that a "[a] disposition that is not a 'conviction,' under state law may still be a 'conviction' for immigration purposes," and therefore, although "state law may define the term 'conviction' not to include a deferred adjudication . . . such an adjudication would be deemed a conviction for purposes of federal immigration law"). Nothing in the record suggests Quiroz Macedo was told at the time that her plea to the Class A misdemeanor offense would be treated as a conviction under federal immigration law, or that such a conviction would subject her to mandatory deportation.

On June 4, 2010, the State moved to revoke Quiroz Macedo's community supervision based on the allegation that she had violated multiple conditions of her supervision, including failing to pay fees, failing to perform community service, and committing the 2010 offenses discussed below. Quiroz Macedo was represented by attorney E. Izaguirre in the revocation proceeding. On July 6, 2010, Quiroz Macedo pled true to the allegations in the motion and agreed to the revocation of her community supervision. There is nothing in the record to indicate Quiroz Macedo was advised that her plea of true would have any immigration consequences.

The same day, the trial court entered a judgment of conviction in the 2009 case, finding Quiroz Macedo guilty of the Class A misdemeanor offense of attempted possession of a controlled substance. She was sentenced to 364 days in the county jail, which was probated, with the condition that she spend 90 days in jail. The trial court certified that the judgment was entered pursuant to a plea bargain agreement and that Quiroz Macedo had no right to appeal.

---

entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and (ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed. (B) Any reference to a term of imprisonment or a sentence with respect to an offense is deemed to include the period of incarceration or confinement ordered by a court of law regardless of any suspension of the imposition or execution of that imprisonment or sentence in whole or in part.

8 U.S.C.A. § 1101(48)(A)(B).

Almost ten years later, in February 2020, a Travis County district court granted Quiroz Macedo's motion for a new trial in her 2009 case, vacating her judgment of conviction and finding that she was "given affirmative mis-advice with respect to the consequences of her conviction, and thus, entered an involuntary plea." Thereafter, the Travis County District Attorney's Office moved to dismiss the 2009 charge against Quiroz Macedo "in the interest of justice." The trial court granted the motion, ordering the case dismissed.

## B. The 2010 offense

On March 9, 2010, Quiroz Macedo was arrested in Williamson County, Texas, for allegedly shoplifting a clothing item valued at less than twenty dollars, a Class C misdemeanor.[5] The record contains the arresting officer's affidavit for warrant of arrest and detention, in which he averred that while transporting Quiroz Macedo to the police station, he informed her of his intent to search her purse. In response, she admitted she "had drugs" in her purse. He averred that he subsequently searched her purse and found six 2-milligram pills of alprazolam, which she stated she did not have a prescription for.

On March 12, 2010, Quiroz Macedo was charged by information with possession of a controlled substance, a Class A misdemeanor. On March 24, she completed a form to request a court-appointed attorney. On March 29, the court appointed W. Watson to represent her.

Two days later, on March 31, 2010, the United States Supreme Court issued its landmark decision in *Padilla v. Kentucky*, holding that counsel is required to inform a non-citizen client of the immigration consequences of entering a guilty plea. *Padilla*, 559 U.S. at 369. Thereafter, on

---

[5] At the time of her arrest, a theft of an item valued at less than $50 was a Class C misdemeanor, which is a fine-only offense not punishable by any jail time. *See* Tex. Penal Code Ann. § 31.03 (e)(1)(A), enacted by Act of May 15, 2007, 80th Leg., R.S., ch. 304, § 1, sec. 37.004, 2007 Tex. Gen. Laws 580 ("Except as provided by Subsection (f) of this section, an offense under this section is: (1) a Class C misdemeanor if the value of the property stolen is less than . . . $50"); *see also* Tex. Penal Code Ann. § 12.23 ("An individual adjudged guilty of a Class C misdemeanor shall be punished by a fine not to exceed $500).

April 8, 2010, Quiroz Macedo appeared in a Williamson County court at law with her attorney, signed plea papers, and pled guilty to the Class A misdemeanor offense of possession of a controlled substance less than two ounces. As part of the plea proceedings, Quiroz Macedo and her counsel signed a form entitled "Admonitions to Defendant," which warned: "if Defendant is not a United States citizen, a plea of 'GUILTY' or 'NO CONTEST' to the offense charged may result in deportation, exclusion from admission to this country, or the denial of naturalization under federal law." Quiroz Macedo signed the form immediately below the following statement: "I have read and accept the admonishments, waivers, and plea agreement above and I am aware of the consequences of my plea." Quiroz Macedo's attorney signed the form below an acknowledgement that read: "I believe Defendant to be mentally competent, and Defendant understands the admonitions, waivers, and consequences of his/her plea. I approve and consent to the foregoing matters and Defendant's signing of this document."

The trial court accepted Quiroz Macedo's guilty plea and entered a judgment of conviction, dated April 8, 2010, of the Class A misdemeanor of possession of a controlled substance less than two ounces. The court sentenced her to 40 days in the Williamson County jail with credit for time served. The trial court certified that the judgment was entered pursuant to a plea bargain and that Quiroz Macedo had no right to appeal. The record does not contain a reporter's record of the hearing at which Quiroz Macedo entered her plea.[6]

C. **The ICE detainer and Quiroz Macedo's release to her mother**

The record includes a document submitted by the State from the U.S. Department of Homeland Security labeled "Continuation Page for Form I213." The document indicates Quiroz Macedo was "found in the Williamson County Jail on March 10, 2010 after having been arrested

---

[6] It is apparently no longer available due to the applicable seven-year record retention schedule.

for [possession of a controlled substance]." She had been interviewed by an agent, and an Immigration and Customs Enforcement (ICE) detainer was placed on her. The document indicates Quiroz Macedo was released from the Williamson County Jail "to that ICE detainer on April 12, 2010, and was served with an I-862, I-200, I-286, I-826, List of Free Legal Services for Immigration, and a Consular Notification Sheet." None of those documents, however, are in the record.

The record includes a document from the U.S. Department of Health and Human Services "Office of Refugee Resettlement, Division of Unaccompanied Children's Services." This document stated, "[p]ursuant to Section 462 of the Homeland Security Act, the Office of Refugee Resettlement (ORR) has released from its custody the above named minor into the care and custody of [Quiroz Macedo's mother]," who was named as her "sponsor." Quiroz Macedo signed the document on June 12, 2010, agreeing to appear at any future immigration hearings and "report to the DHS/ICE Office if so ordered."

According to an affidavit submitted by P. Espinosa, who states that his law firm is currently representing Quiroz Macedo in her pending immigration proceedings, Quiroz Macedo had a "preliminary immigration hearing following her conviction in [the 2010] case and was released from detention." There is nothing in the record to indicate that the government set any immigration hearings after that time, or that Quiroz Macedo was ordered to report to the DHS/ICE Office—at least until June 8, 2020—when, according to Espinosa's affidavit, Macedo's "second immigration hearing [was] scheduled."

### D.  Quiroz Macedo's habeas petition

On March 13, 2020, Quiroz Macedo filed her "Application for Writ of Habeas Corpus" in the Williamson County court where she was convicted of the 2010 offense, alleging she had been

denied her right to the effective assistance of counsel under *Padilla* during her 2010 plea proceedings because her attorney had failed to advise her of at least two immigration consequences of her plea. First, she complained Watson had failed to inform her that, under federal immigration law, her plea to a controlled substance offense rendered her subject to mandatory deportation and rendered her "ineligible for any form of immigration relief," including cancellation of removal proceedings. Second, Quiroz Macedo complained and averred in her attached affidavit that Watson had failed to inform her that at the time of her plea, a second conviction for possession (or attempted possession) of a controlled substance was treated as an "aggravated felony," which also rendered her subject to mandatory deportation with no opportunity to seek any form of discretionary relief. Quiroz Macedo also averred in her affidavit that, to her knowledge, Watson did not speak with an immigration attorney before she entered her plea, and she complained that he did not advise her that her plea could impact her "potential SIJ (Special Immigration Juvenile) status." She averred that, "Had I been advised of these immigration consequences, I would not have entered the plea agreement, and would have taken my case to trial."

Quiroz Macedo also attached an affidavit from attorney Watson, stating he represented Quiroz Macedo in her 2010 plea proceeding, and averring:

> From November 2009 to June 2010, I was appointed as counsel on misdemeanor cases in Williamson County. The time between November 2009 and June 2010 was the only time in my career that I practiced criminal law. Several of those cases involved drug offenses. From November 2009 to June 2010, I was appointed as counsel in approximately twenty-five cases. I have not practiced criminal law since June 2010.

> When I served as appointed counsel on misdemeanor cases, I never consulted with immigration attorneys about specific immigration consequences. I do not have experience with immigration law and never practiced immigration law.

Macedo also presented an affidavit from P. Espinosa, dated May 4, 2020, stating he represents Quiroz Macedo in ongoing immigration proceedings and averring:

8

My firm, Lorenzon Law LLC, began to work with Ms. Quiroz Macedo around April 2014. Ms. Quiroz Macedo is currently in removal proceedings.

Ms. Quiroz Macedo had a preliminary hearing following her conviction in this case and was released from detention. Ms. Quiroz Macedo's second immigration hearing is scheduled for June 8, 2020. As such, Ms. Quiroz Macedo has not been at risk for deportation until recently.

Ms. Quiroz Macedo's conviction in the underlying case automatically bars her from cancellation of removal. Ms. Quiroz Macedo has a three year-old son who is a U.S. Citizen and who has a rare chromosomal disorder. Ms. Quiroz Macedo [is] his primary caretaker. Due to these circumstances, Ms. Quiroz Macedo would likely be eligible for cancellation of removal, but for this conviction.[7]

Quiroz Macedo petitioned the habeas court to "[vacate] her unlawfully obtained plea and/or sentence."

### E.  The State's response

The State filed a response urging the court to deny the application. The State first argued the trial court lacked jurisdiction to hear the application because Quiroz Macedo's liberty was not being restrained, as she was released from custody in June 2010. The State also argued Quiroz Macedo was barred from bringing her application based on laches, contending that she could not justify the almost ten-year delay in bringing her habeas application and the State was "seriously prejudiced by the 'the diminished memories of trial participants and the diminished availability of the State's evidence.'" The State provided an affidavit from an administrator in the Williamson County Attorney's Office, explaining that the Office only retains physical files of a defendant's

---

[7] In its response to Quiroz Macedo's motion for rehearing, the State contends for the first time that Espinosa's affidavit fails to state he is an attorney. The State contends the basis for Espinosa's opinion regarding Macedo's eligibility for cancellation of removal is therefore unclear. We note, however, that Espinosa's affidavit clearly states he is "representing" Macedo in her immigration proceedings, and we therefore understand that he is either an attorney or another individual qualified to represent clients in court who would have knowledge of the applicable immigration laws. In addition, in its factual findings, the trial court referred to Espinosa as an immigration attorney, and the State did not challenge that finding in the trial court. To the contrary, in its brief, the State referred to him as an "immigration attorney." We therefore find no merit in the State's attempts to discount Espinosa's affidavit.

case for seven years following a conviction. Finally, the State argued on the merits that Quiroz Macedo was not denied effective assistance of counsel, asserting Watson had no obligation to inform Quiroz Macedo of the specific immigration consequences of her plea, but even if he did, she cannot show she was prejudiced by his failure.

## F. The trial court's ruling

Without holding a hearing, the trial court granted Quiroz Macedo's application, making detailed findings of fact and conclusions of law.

### (1) The trial court's findings of fact

In its findings of fact, the trial court stated it had "reviewed the affidavit of W[.] Watson [and] finds Watson is a credible witness and the contents of his affidavit are credible." The court found that Watson had only practiced criminal law for a period between November 2009 and June 2010, and was appointed to 25 misdemeanor cases during that time, including Quiroz Macedo's case. The court found that during that time, Watson "never consulted with an immigration attorney about specific immigration consequences for his criminal case clients [and had] never practiced immigration law and had no experience with immigration law." The court concluded, "Based on Watson's affidavit, the court finds Watson did not fully advise [Quiroz Macedo] of the immigration consequences of her guilty plea."

The trial court further found P. Espinosa was "a credible witness and the contents of his affidavit are credible." Based on his affidavit, the court found that Quiroz Macedo was not a United States citizen, and that "Espinosa is currently representing [her] in ongoing immigration proceedings directly connected to her conviction in this case." Finally, the court found: "Espinosa is representing [Quiroz Macedo] currently in removal proceedings, [she is] facing deportation, and [she] has not been at risk for deportation until recently."

10

### (2) The trial court's conclusions of law

In its conclusions of law, the trial court first concluded that it had jurisdiction to hear Quiroz Macedo's habeas application, as she was being "restrained of her liberty by the conviction in this case" by facing removal from the country as the result of her conviction, which placed her "under continued restraint" (citing *Ex parte Harrington*, 310 S.W.3d 452, 456–57 (Tex. Crim. App. 2010)). The court rejected the State's laches defense, concluding that the State did not meet its burden of proving by a preponderance of the evidence that Quiroz Macedo's delay in bringing her habeas petition was "unreasonable" or that the State suffered "prejudice result[ing] from that delay."

The trial court also concluded that at the time Quiroz Macedo entered her plea in April 2010, Watson was required under *Padilla* to inform her of the clear and succinct consequences of her plea. The trial court observed two clear and succinct consequences of the plea. First, the court noted that a conviction for a controlled-substance offense rendered her "inadmissible to the United States" and "ineligible for discretionary forms of relief." Second, the court observed that at the time of her plea, "a second conviction for possession of controlled substance was considered an aggravated felony for immigration purposes in the Fifth Circuit" (citing *Carachuri-Rosendo v. Holder*, 570 F.3d 263, 267–68 (5th Cir. 2009), *rev'd*, 560 U.S. 563 (2010)).[8] The court recognized that "[p]ossession of controlled substance convictions and aggravated felony convictions have particularly severe consequences within the immigration context, such as precluding any

---

[8] On June 14, 2010, the United States Supreme Court reversed the Fifth Circuit Court of Appeals' opinion and held that a defendant who has been convicted of a simple possession offense which has not been enhanced based on a prior conviction—as in this case—has not been "convicted" under § 1229b(a)(3) of a "felony punishable" as such "under the Controlled Substances Act," 18 U.S.C. § 924(c)(2), and thus such a conviction is not considered an aggravated felony for federal immigration purposes. *Carachuri-Rosendo v. Holder*, 560 U.S. 563, 582 (2010). Accordingly, it appears that Quiroz Macedo's second conviction can no longer be treated as an aggravated felony for removal purposes. Nonetheless, as set forth above, at the relevant time of her plea, her second conviction for a controlled substance offense was considered an aggravated felony for federal immigration purposes.

11

discretionary relief."

The court therefore concluded, "Watson's performance fell below an objective standard of reasonableness when he failed to advise [Quiroz Macedo] of the immigration consequences of her plea as required by *Padilla*." The court further concluded Quiroz Macedo "was prejudiced by Watson's failure to advise her of the substantial immigration consequences of her guilty plea[,]" and there was a "reasonable probability that but for the deficient performance, the result of the proceedings would have been different, and she would not have pleaded guilty and would have insisted on going to trial."

Determining Quiroz Macedo's "plea of guilty in this case was involuntary under Article I § 9 of the Texas Constitution and under the Sixth and Fourteenth Amendments to the United States Constitution[, as] Watson rendered constitutionally deficient advice to [Quiroz Macedo] by the failure to inform her of the immigration consequences of her guilty plea[,]" the trial court granted the relief requested in Quiroz Macedo's habeas application.

The State appeals from that order.[9]

## II. ISSUES ON APPEAL

The State makes two broad arguments for reversing the trial court's judgment granting habeas relief: (1) the trial court erred in its application of the law regarding ineffective assistance of counsel under the prevailing standard of professional norms in 2010, and (2) the trial court erred when it determined laches did not bar Quiroz Macedo's claim for relief.

---

[9] The State also filed a "motion for additional findings of fact (in respect to laches)" in the trial court, but it appears the court did not rule on that motion and that it was therefore overruled by operation of law.

# III. APPLICABLE LAW AND STANDARD OF REVIEW

## A. Jurisdictional issues

After final conviction in any misdemeanor case, an applicant may apply for a writ of habeas corpus to the judge of the court in which the applicant was convicted. Tex. Code Crim. Proc. Ann. art. 11.09(b). "For a court to have jurisdiction over a habeas application in a misdemeanor case under article 11.09, an applicant must be 'confined' or 'restrained' by either an accusation or a conviction." *Ex parte Karlson*, 282 S.W.3d 118, 126 (Tex. App.—Fort Worth 2009, pet. ref'd) (citing *Ex parte Schmidt,* 109 S.W.3d 480, 483 (Tex. Crim. App. 2003)). However, the fact that an individual is not physically confined does not preclude his application or deprive the trial court of jurisdiction if he is otherwise suffering "collateral legal consequences" from the conviction. *See Ex parte Crosley*, 548 S.W.2d 409, 410 (Tex. Crim. App. 1977) ("Even though the applicant may have been discharged from confinement, collateral legal consequences of his [misdemeanor] conviction may entitle him to relief."); *see also Ex parte Harrington*, 310 S.W.3d at 457 (recognizing a defendant need not be in physical custody to be entitled to bring an application for a writ of habeas corpus pursuant to Texas Code of Criminal Procedure Article 11.09 and may instead allege he is suffering "collateral consequences" as the result of his conviction). Significant to this appeal, a county court of law has habeas jurisdiction if the applicant has deportation proceedings pending against him based solely on his misdemeanor convictions. *State v. Garcia*, 651 S.W.3d 506, 511 (Tex. App.—Houston [14th Dist.] 2022, pet. ref'd); *see also Ex parte Garcia*, 547 S.W.3d 228, 230 (Tex. Crim. App. 2018) (finding defendant's pre-*Padilla* claim that he was given mis-advice about the immigration consequences of his plea to be cognizable in a habeas proceeding).

Here, the trial court found Quiroz Macedo is currently facing a removal proceeding that is "directly connected to her conviction in this case," and the State does not dispute that finding. We therefore conclude that because of her conviction in this case, Quiroz Macedo is suffering from the "collateral consequences" of her conviction, and the trial court had jurisdiction to hear her habeas application.

## B. Standard of review on appeal from a trial court's habeas ruling

"An appellate court reviewing a habeas judge's ruling in an article 11.09 application for writ of habeas corpus must view the evidence in the record in the light most favorable to the judge's ruling and must uphold that ruling absent an abuse of discretion." *Diamond v. State*, 613 S.W.3d 536, 544 (Tex. Crim. App. 2020). A trial court does not abuse its discretion unless it acts "arbitrarily or unreasonably" or "without reference to any guiding rules and principles," or its decision "falls outside the zone of reasonable disagreement." *See State v. Hill*, 499 S.W.3d 853, 865 & n.34 (Tex. Crim. App. 2016) (quoting *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990) (en banc)); *see also Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016).

In an Article 11.09 writ proceeding, "the trial judge is the *sole* fact finder." *Diamond*, 613 S.W.3d at 545 (emphasis in original). Thus, "[a]n appellate court affords almost total deference to a habeas court's factual findings when they are supported by the record, especially when those findings are based on credibility and demeanor." *Id*. at 544 (citing *Ex parte Garcia*, 353 S.W.3d 785, 787–88 (Tex. Crim. App. 2011)); *see also Ex parte Amezquita*, 223 S.W.3d 363, 367 (Tex. Crim. App. 2006) ("When the trial court's findings of fact in a habeas corpus proceeding are supported by the record, they should be accepted by this Court."). This level of deference must be given to a trial court's factual findings "even when no witnesses testify and all of the evidence is

14

submitted through affidavits, depositions, or interrogatories." *Guerrero*, 400 S.W.3d at 583; *see also Ex parte Wheeler*, 203 S.W.3d 317, 325–26 (Tex. Crim. App. 2006) (recognizing that an appellate court must defer to a trial court's factual findings even when the only evidence is submitted by affidavits).

Accordingly, as the Texas Court of Criminal Appeals recently recognized, when "two plausible interpretations" of the evidence are presented, the trial court is "better positioned" to make the "call" as to which interpretation it finds most plausible, and its ruling will not be disturbed if it was "within the zone of reasonable disagreement." *State v. Hradek*, No. PD-0083-23, 2024 WL 5059142, at *9 (Tex. Crim. App. Dec. 11, 2024) (citing *Najar v. State*, 618 S.W.3d 366, 372 (Tex. Crim. App. 2021) ("[I]f there are 'at least two' plausible interpretations of the evidence, it is within the trial court's exclusive purview to decide which interpretation to believe."); *Burch v. State*, 541 S.W.3d 816, 820 (Tex. Crim. App. 2017) ("The trial court's ruling is within the 'zone of reasonable disagreement' when there are two reasonable views of the evidence.")).

"This degree of deference also applies to any implied findings and conclusions supported by the record." *Diamond*, 613 S.W.3d at 544. But "if the resolution of the ultimate question turns only on the application of legal standards, the appellate court reviews those determinations de novo." *Id.* An appellate court will uphold the habeas court's ruling if it is correct under any theory of applicable law. *Id.* at 544−45.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

In Issue One, the State maintains the trial court erred in finding Quiroz Macedo was denied her right to effective assistance of counsel. For the reasons below, we disagree.

**A. Requirements for establishing a claim of ineffective assistance of counsel**

To prevail on a claim of ineffective assistance of counsel (an IAC claim), a habeas applicant bears the burden to prove, by a preponderance of the evidence, both deficient performance by counsel and prejudice suffered by the applicant. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Ex parte Bowman*, 533 S.W.3d 337, 349 (Tex. Crim. App. 2017). The applicant must first demonstrate counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 687–88; *Ex parte Bowman*, 533 S.W.3d at 349. Appellate review of counsel's representation is highly deferential, which requires us to "indulge in a strong presumption that counsel's conduct was *not* deficient." *Nava v. State*, 415 S.W.3d 289, 307–08 (Tex. Crim. App. 2013) (emphasis in original). To rebut that presumption, an IAC claim must be "'firmly founded in the record' and 'the record must affirmatively demonstrate' the meritorious nature of the claim." *Menefield v. State*, 363 S.W.3d 591, 592 (Tex. Crim App. 2012) (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)).

The applicant has the burden to further show the existence of a reasonable probability—sufficient to undermine confidence in the outcome—that the result of the proceeding would have been different absent counsel's deficient performance. *Strickland*, 466 U.S. at 694; *Nava*, 415 S.W.3d at 307–08. In the context of a collateral challenge to a guilty plea, the focus of the prejudice inquiry is on "whether counsel's constitutionally ineffective performance affected the outcome of the plea process" and whether a defendant has shown that "but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *See Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

As the Texas Court of Criminal Appeals recently explained, "IAC prejudice is a mixed question of law and fact, and some questions of fact may turn on the credibility and demeanor of

the witnesses," and therefore, [a]ppellate courts should afford almost total deference to a trial court's determinations of those questions." *Hradek*, 2024 WL 5059142, at *6 (citing *Kober v. State*, 988 S.W.2d 230, 233 (Tex. Crim. App. 1999)). But "[m]ixed questions of law and fact that do not depend on an evaluation of credibility and demeanor may be reviewed *de novo.*" *Id*. (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). Therefore, while the "ultimate question of whether prejudice existed is reviewed *de novo . . .* the trial court should be afforded deference on any underlying historical fact determinations." *Id*. (citing *Johnson v. State*, 169 S.W.3d 223, 239 (Tex. Crim. App. 2005)). And an appellate court therefore errs when it fails to afford deference to the trial court's factual findings. *Id*. at *9 (concluding appellate court erred by failing to afford the required deference to the trial court's factual findings in an IAC case).

## B. Counsel's obligations in plea proceedings under *Padilla*

A criminal defendant has a constitutional right to effective assistance of counsel in a plea proceeding. *See McMann v. Richardson*, 397 U.S. 759, 770–71 (1970); *Ex parte Harrington*, 310 S.W.3d at 458. A guilty plea is not voluntary if made as a result of ineffective assistance of counsel. *Ex parte Moussazadeh*, 361 S.W.3d 684, 689 (Tex. Crim. App. 2012). In *Padilla*, the Supreme Court expanded the scope of the Sixth Amendment right to effective assistance of counsel to require an attorney for a noncitizen criminal defendant to provide advice about the risk of deportation arising from a guilty plea. *Padilla*, 559 U.S. at 374. In doing so, the Court created two standards to which attorneys are held, depending on the clarity in the law. The Court first recognized that because immigration law can be complex, there will "undoubtedly be numerous situations in which the deportation consequences of a particular plea are unclear or uncertain." *Id*. at 369. When "the law is not succinct and straightforward . . . a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse

17

immigration consequences." *Id*. But, "when the deportation consequence is truly clear . . . the duty to give correct advice is equally clear." *Id.*

In *Padilla*, a noncitizen defendant who had permanent residency status pled guilty to a charge of drug distribution, and before entering his plea, his attorney told him he "did not have to worry about immigration status since he had been in the country so long." *Id.* at 359. However, this advice was erroneous, as his plea made him "subject to automatic deportation" and deprived him of the right to seek any "discretionary relief from deportation." *Id*. at 359–60, 363–64. In holding his plea had been involuntarily entered, the Court concluded that a "constitutionally competent counsel would have advised him that his conviction for drug distribution made him subject to automatic deportation" prior to the entry of his guilty plea. *Id.* at 360. In reaching this conclusion, the Court recognized "the terms of the relevant immigration statute are succinct, clear, and explicit in defining the removal consequence for Padilla's conviction." *Id*. at 368 (citing 8 U.S.C. § 1227(a)(2)(B)(i): "Any alien who at any time after admission has been convicted of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States or a foreign country relating to a controlled substance . . . other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is deportable")). The Court further observed that, "Padilla's counsel could have easily determined that his plea would make him eligible for deportation simply from reading the text of the statute, which addresses not some broad classification of crimes but specifically commands removal for all controlled substances convictions except for the most trivial of marijuana possession offenses." *Id*.

In recognizing the need for a noncitizen defendant to be informed of the clear immigration consequences of his plea, the Court noted, "[p]reserving the client's right to remain in the United States may be more important to the client than any potential jail sentence." *Id*. at 368 (citing *INS*

18

*v. St. Cyr*, 533 U.S. 289, 322 (2001)). Therefore, "'[p]reserving the . . . right to remain in the United States' and 'preserving the possibility of' discretionary relief from deportation" are among the principal benefits a defendant may consider in "deciding whether to accept a plea offer or instead to proceed to trial." *Id.* (quoting *St. Cyr*, 533 U.S. at 323).

Though the Court recognized that the types of discretionary relief available to a defendant has changed over the years, under the law in existence at the time the defendant entered his plea, the Attorney General had the discretion to cancel removal proceedings for noncitizens convicted of "particular classes of offenses." *Id.* at 364. But, as the Court observed, this form of relief was not available to the defendant in light of his plea to an aggravated felony. *Id.* (citing 8 U.S.C.A. § 1101(a)(43)(B) (providing that the illicit trafficking in a controlled substance, including "a drug trafficking crime," is considered an aggravated felony); 8 U.S.C.A. § 1228(a)(3)(c) (providing "[a]n alien convicted of an aggravated felony shall be conclusively presumed to be deportable from the United States" and providing for the expedited removal of such aliens)).

Relying on its prior holdings, the Court further stated, "We expected that counsel who were unaware of the discretionary relief measures would 'follo[w] the advice of numerous practice guides' to advise themselves of the importance of this particular form of discretionary relief." *Id.* at 368 (citing *St. Cyr*, 533 U.S. at 323 n.50). And the Court noted that counsel could have "easily" determined the consequences of the defendant's plea from reading the removal statute, which rendered his deportation "presumptively mandatory," depriving him of the opportunity to seek discretionary relief. *Id.* at 368–69. Because counsel failed to advise the defendant of this clear and succinct consequence of his plea, and provided him with "incorrect" advice on the subject, the Court held the defendant had sufficiently alleged constitutional deficiency to satisfy the first prong

of *Strickland*. *Id*. But it remanded to the Kentucky courts to consider in the first instance whether the defendant was prejudiced by his counsel's ineffectiveness. *Id.* at 369, 374–75.

### C. Quiroz Macedo's plea had clear and succinct immigration consequences

As in *Padilla*, we conclude that there were clear and succinct immigration consequences to Quiroz Macedo's 2010 guilty plea.

Standing alone, Quiroz Macedo's guilty plea to a controlled substance offense subjected her to mandatory removal and deprived her of the opportunity to seek discretionary relief in a removal proceeding. *See Ex parte Torres*, 483 S.W.3d 35, 44–45 (Tex. Crim. App. 2016) (defendant faced clear and succinct immigration consequences where his plea to a controlled substance offense subjected him to "presumptively mandatory" removal from the country and deprived him of the opportunity to seek discretionary relief from removal); *Ex parte Aguilar*, 537 S.W.3d 122, 126–27 (Tex. Crim. App. 2017) (recognizing that when an individual is convicted of a controlled substance offense, their removal is "practically inevitable").

In addition, as the trial court observed, at the time of her plea, Quiroz Macedo had already been "convicted" of a controlled substance offense in the 2009 proceeding; therefore, her second conviction for possession of a controlled substance in the 2010 proceeding was considered an "aggravated felony" in the Fifth Circuit for federal immigration purposes. *See Carachuri-Rosendo*, 570 F.3d at 267–68. Like a conviction for a controlled substance offense, a conviction for an aggravated felony also results in presumptively mandatory removal, thereby depriving a defendant of the opportunity to seek discretionary relief from removal. *See Ex parte Torres*, 483 S.W.3d at 44–45 (recognizing a defendant convicted of an aggravated felony is "subject to deportation and appears to preclude the availability of any discretionary relief from his deportation") (citing 8 U.S.C. §§ 1227(a)(2)(A)(iii) ("Any alien who is convicted of an aggravated felony at any time

after admission is deportable."); § 1229b (limiting authority of Attorney General to cancel removal for certain lawful permanent residents to those individuals who have "not been convicted of any aggravated felony")); *see also Lee v. United States*, 582 U.S. 357, 361 (2017) (recognizing that a plea to an aggravated felony results in "mandatory deportation").

As numerous courts have recognized, under *Padilla,* an attorney has a constitutional duty to advise his client that a plea to either a controlled substance offense or an aggravated felony offense will subject him to mandatory removal and deprive him of the opportunity to seek discretionary or equitable relief in a removal proceeding. *See Ex Parte Torres*, 483 S.W.3d at 45 (recognizing counsel was "obligated to inform appellant of the 'presumptively mandatory' immigration-law consequences of his plea that would make him 'subject to automatic deportation'"); *Ex parte Rodriguez*, 378 S.W.3d 486, 492–93 (Tex. App.—San Antonio 2012, pet. ref'd) (recognizing that under *Padilla*, an attorney's duty to advise a noncitizen client of the deportation consequences of a plea includes "advice regarding discretionary relief"); *Ex parte Huynh*, No. 01-20-00077-CR, 2022 WL 210137, at *7 (Tex. App.—Houston [1st Dist.] Jan. 25, 2022, no pet.) (mem. op., not designated for publication) (holding trial counsel had a constitutional duty to advise his client that removal was "a virtual legal certainty" upon his plea of guilty to a Class A misdemeanor offense of possession of a controlled substance); *Munoz v. State*, No. 01-18-00882-CR, 2020 WL 1584480, at *10 (Tex. App.—Houston [1st Dist.] Apr. 2, 2020, pet. ref'd) (mem. op., not designated for publication) (recognizing counsel had a duty under *Padilla* to advise his client that if he chose to plead guilty to possession of a controlled substance, his "subsequent removal was not merely a possibility but was presumptively mandatory and virtually certain").

21

**D. Counsel had a duty to inform Quiroz Macedo of the immigration consequences of her plea despite her undocumented noncitizen status**

The State, however, seeks to distinguish *Padilla* on the ground that Quiroz Macedo—unlike the defendant in *Padilla* who was a permanent resident—was an "undocumented alien," who entered the country illegally and was therefore already "deportable." And the State appears to be arguing that, because of her status as an already-deportable undocumented alien, Watson could not be found ineffective for failing to inform Quiroz Macedo of the immigration consequences of her plea. In support of its argument, the State asserts, "[b]oth the Court of Criminal Appeals and the Third Court of Appeals have refused to find counsel ineffective for failing to advise a client of the risk of immigration consequences for clients lacking legal immigration status, noting when undocumented, a noncitizen was 'deportable for that reason alone' and would remain deportable even after an acquittal," citing *Guerrero*, 400 S.W.3d at 588–89, and *Simon v. State*, No. 03-17-00215-CR, 2018 WL 3468688, at *7–8 (Tex. App.—Austin July 19, 2018, no pet.) (mem. op., not designated for publication). But neither opinion stands for that proposition that an undocumented noncitizen is not entitled to be informed of the immigration consequences of his plea, and both opinions are, in any event, factually distinguishable from Quiroz Macedo's situation.

In *Guerrero*, the defendant, an undocumented alien who entered the country illegally as a child, pled guilty in 1998 to a Class A misdemeanor possession of less than two ounces of marijuana. 400 S.W.3d at 580. Ten years later, he sought to vacate his plea by filing what the court construed as an application for a writ of habeas corpus, complaining that he entered the plea without an attorney and that he did not voluntarily waive his right to counsel. *Id.* at 581. As part of his claim that he was prejudiced by waiving his right to counsel, he averred that if he had been represented by counsel and told of the immigration consequences of his plea, i.e., that he would

22

face mandatory removal without the opportunity to seek any discretionary relief, he would not have entered the plea and would have instead gone to trial. *Id*. at 580–81. The Court of Criminal Appeals held that the trial court erred in granting his habeas application for several reasons that distinguish the defendant's case from Quiroz Macedo's situation.

First, the court concluded that the written record belied the defendant's claim that he did not voluntarily waive his right to counsel, as the record contained the defendant's signature on the plea documents, stating he was voluntarily and knowingly waiving his right to counsel, and the defendant failed to present any sworn testimony to contradict the written record. *Id*. at 586–87. In addition, the court observed that even if the defendant had been appointed counsel, his attorney would not have been obligated to inform him of the immigration consequences of his plea, as his plea was entered prior to the Supreme Court's ruling in *Padilla.* And as the court observed, *Padilla* announced a "new rule" and therefore could not be applied retroactively to the defendant's case. *Id*. at 587–88. In contrast, Quiroz Macedo entered her plea after *Padilla* was decided, and her attorney therefore had a duty to inform her of the immigration consequences of her plea.[10]

Second, the court in *Guerrero* found it significant that the defendant, who was an undocumented alien was being deported—not because of his plea—but solely because of his illegal entry into the country. *Id*. at 588–89. The court therefore concluded the defendant could not demonstrate any prejudice from his attorney's failure to inform him of the immigration consequences of his plea. *Id*.; *see also Loch v. State*, 621 S.W.3d 279, 282 (Tex. Crim. App. 2021) (recognizing the defendant in *Guerrero* was being deported solely because he was an

---

[10] In its brief, the State appears to be contending that Watson should not be found ineffective under *Padilla* because of the "suddenness" of the Court's ruling in that case, noting *Padilla* was decided only days before Quiroz Macedo entered her plea and arguing the requirements set forth in the *Padilla* opinion were new, "novel," and not clearly defined at the time. We disagree. While *Padilla* may not be applied retroactively given its announcement of a "new rule," the State has not cited any authority that would allow an attorney to escape its reach simply because it was announced in the days before a defendant's plea hearing.

"undocumented immigrant" and any failure to admonish the defendant was "harmless"). But, in contrast to the facts in *Guerrero*, here, the trial court found in its order that the removal proceedings against Quiroz Macedo were initiated precisely because of her plea, which, as discussed below, provides the basis for her claim of prejudice.

The holding in *Simon v. State* is also distinguishable from Quiroz Macedo's case for similar reasons. As in *Guerrero*, the defendant in *Simon* was an undocumented noncitizen who pled guilty to possession of a controlled substance prior to the Supreme Court's opinion in *Padilla. Simon*, 2018 WL 3468688, at *1. Although he pled guilty in 2009, he filed his application for a writ of habeas corpus seven years later when he was faced with removal proceedings. *Id.* Because his plea was entered before *Padilla* was decided, he did not complain that his attorney failed to inform him of the immigration consequences of his plea; instead, he asserted his attorney was ineffective because he allegedly gave him "affirmative misadvice" regarding the consequences of his plea, i.e., that he "wouldn't go to jail" as the result of his plea, or that "it was all going to work out" for him.[11] *Id.* at *2, 4–5. The district court denied the defendant's application, and the Austin Court of Appeals affirmed the denial. In doing so, the Austin Court first held that—assuming the defendant preserved the issue for appeal—the record supported a finding that the defendant failed to establish his attorney affirmatively misadvised him about the consequences of his plea given the "ambiguous" nature of the statements he claimed his attorney made to him. *Id*. at *6.

Second, the Austin Court held the "district court would not have abused its discretion in finding that [the defendant] had failed to prove prejudice" under the second prong of the *Strickland*

---

[11] As the court in *Simon* recognized, although *Padilla* announced a "new rule" and could not be applied retroactively, a defendant is still entitled to bring a claim of ineffective assistance of counsel for a plea entered prior to *Padilla* in situations in which counsel "affirmatively misadvised [the defendant] of the immigration consequences of his guilty plea." *See Simon v. State*, No. 03-17-00215-CR, 2018 WL 3468688, at *4 (Tex. App.—Austin July 19, 2018, no pet.) (mem. op., not designated for publication) (citing *Ex parte Garcia*, 547 S.W.3d 228, 230 (Tex. Crim. App. 2018)).

test, as the record supported a finding that there was no reasonable probability the defendant would have rejected the plea even if he had been correctly informed of the immigration consequences of his plea given his status as an undocumented noncitizen who was already subject to deportation. *Id.* But unlike Quiroz Macedo, the defendant in *Simon* did not complain that his plea deprived him of the right to seek discretionary or other equitable relief from removal, and it does not appear the trial court considered whether he was entitled to any such relief as a factor in its decision to deny him relief.

Thus, while the courts in both *Guerrero* and *Simon* found the defendants therein were not entitled to habeas relief based on various factors unique to those cases, nothing in either case stands for the proposition that an attorney representing an undocumented noncitizen—who is already deportable—does not have a duty in a post-*Padilla* plea proceeding to inform his client of the specific immigration consequences of her plea if they are, as in this case, clear. *Padilla*, 559 U.S. at 357 ("when the deportation consequence is truly clear . . . the duty to give correct advice is equally clear"). Accordingly, we conclude that, despite Quiroz Macedo's status as an "already deportable" undocumented noncitizen, her attorney had a duty under *Padilla t*o inform her that her plea would subject her to mandatory removal from the country and deprive her of the opportunity to seek any form of discretionary or equitable relief from removal. For example, but for her plea, Quiroz Macedo would have had the opportunity to seek a "hardship" exception to her removal under 8 U.S.C.A. § 1229b(b)(D), which provides the U.S. Attorney General "may cancel removal of, and adjust to the status of an alien lawfully admitted for permanent residence, an alien who is inadmissible or deportable from the United States if the alien" has met certain requirements, and they can establish that their removal "would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully

admitted for permanent residence." 8 U.S.C.A. § 1229b(b)(1)(D). This equitable relief, however, is not available to a defendant who had been convicted of either a controlled substance offense under section 1182(a)(2), or an aggravated felony. 8 U.S.C.A. § 1229b(b)(C) (providing such relief is only afforded to a person who "has not been convicted of an offense under section 1182(a)(2), 1227(a)(2), or 1227(a)(3) of this title").

In addition, as Quiroz Macedo also points out—assuming that she was qualified—her plea deprived her of the opportunity to seek Special Immigrant Juvenile (SIJ) status under 8 U.S.C.A. § 1101(a)(27) (J), which Congress established "to protect abused, neglected or abandoned children who, with their families, illegally entered the United States . . . ."[12] *See Osorio-Martinez v. Attorney Gen. United States of Am.*, 893 F.3d 153, 163 (3d Cir. 2018). Although Congress granted "certain protections against removal for this class of young immigrants," expressly prohibiting their removal for having entered the country illegally, it nevertheless allowed for removal based on a juvenile's conviction of a controlled substance offense. *See Rodriguez v. Perry*, No. 1:24-CV-651 (LMB/WMP), 2024 WL 4024047, at *4 (E.D. Va. Sept. 3, 2024) (recognizing that "although a juvenile with SIJ status can be removed on certain grounds, such as having been convicted of a serious criminal offense, he cannot be removed for having entered the country illegally"); *see also*

---

[12] For purposes of SIJ status, the term, "special immigrant," means:

[A]n immigrant who is present in the United States--(i) who has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State, or an individual or entity appointed by a State or juvenile court located in the United States, and whose reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law; (ii) for whom it has been determined in administrative or judicial proceedings that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence; and (iii) in whose case the Secretary of Homeland Security consents to the grant of special immigrant juvenile status, except that--(I) no juvenile court has jurisdiction to determine the custody status or placement of an alien in the custody of the Secretary of Health and Human Services unless the Secretary of Health and Human Services specifically consents to such jurisdiction; and (II) no natural parent or prior adoptive parent of any alien provided special immigrant status under this subparagraph shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this chapter.

8 U.S.C.A. § 1101(a)(27)(J).

8 U.S.C.A. § 1227(c) (providing that certain grounds for removal do not apply to a juvenile on SIJ status, but that a juvenile on SIJ status may be removed based on a conviction for a controlled substance offense under § 1182(a)(2)).

In sum, we conclude that federal immigration law provided "succinct, clear, and explicit" consequences to Quiroz Macedo's plea and required her attorney to inform her of those consequences. *See Torres*, 483 S.W.3d at 4445 (citing *Padilla,* 559 U.S. at 368). In making this determination, we are not suggesting that counsel must warn a defendant of every possible form of equitable relief that she might be giving up in the future, or what the government might actually do in her case. *Id.* at 45–46 (recognizing that "counsel cannot always accurately predict the future as to whether a particular individual will, in fact, ultimately be deported"). But as the Court of Criminal Appeals has recognized, "predicting the future is not what *Padilla* requires." *Id*. at 46. Instead, *Padilla* requires that counsel give a defendant accurate legal advice about the 'truly clear' consequences of a plea of guilty to an offense that, as a matter of law, renders him "subject to automatic deportation." *Id*. (citing *Padilla,* 559 U.S. at 360, 369). Because we have found that Quiroz Macedo's plea rendered her subject to the truly clear consequence of facing mandatory deportation, we turn to the question of whether the record supports the trial court's finding that Watson failed to inform her of such.

### E. The record supports the trial court's finding that Watson did not inform Quiroz Macedo of the clear and succinct immigration consequences of her plea

The State contends that even if Watson was required to inform Quiroz Macedo of the immigration consequences of her plea, the trial court abused its discretion in finding she met her burden of establishing that Watson failed to do so. We disagree. Applying the correct standard of review and giving the trial court the requisite deference to its factual findings, we conclude the record supports the trial court's finding that Watson failed to properly inform Quiroz Macedo of

27

the clear and succinct immigration consequences of her plea.

As a preliminary matter, the State urges us to apply a "presumption of regularity" to the judicial proceedings and presume from the written record of the 2010 plea proceedings that Watson adequately informed Quiroz Macedo of the consequences of her plea. But in this instance, the written record belies rather than supports a finding that Watson properly informed Quiroz Macedo of clear and succinct immigration consequences of her plea. As set forth above, the written documents Quiroz Macedo and Watson signed at the time of the plea hearing provided that she understood her plea "may result in deportation, exclusion from admission to this country, or the denial of naturalization under federal law." At most, this document establishes Quiroz Macedo was informed that her plea could lead to the *possibility* of her deportation. However, given the clear and succinct consequences of her plea, i.e., that her plea subjected her to mandatory removal, this written admonition fell short of counsel's obligations under *Padilla*. *See Ex parte Torres*, 483 S.W.3d at 45 (recognizing that "it was not enough for counsel to advise appellant that he might be deported; rather, counsel was required to inform appellant that, under these circumstances, his deportation was a virtual legal certainty"); *see also Munoz v. State*, 2020 WL 1584480, at *5 (recognizing that because a defendant's plea to a controlled-substance offense resulted in a "virtual legal certainty" he would be deported, counsel's advice that he "might" be deported was insufficient to satisfy *Padilla*); *Ex parte Leal*, 427 S.W.3d 455, 461 (Tex. App.—San Antonio 2014, no pet.) (counsel did not meet the requirements of *Padilla* where he told defendant that his plea to a controlled-substance offense, which had mandatory deportation consequences, "was going to result in deportation proceedings," as this was "not the equivalent of advising the defendant that his conviction will result in deportation").

In addition, Quiroz Macedo submitted an affidavit from which the trial court could have reasonably determined that Watson did not inform her that her plea would subject her to mandatory removal or that it would deprive her of the opportunity to seek discretionary or other equitable relief from removal. As set forth above, she averred in her affidavit that Watson did not advise her of the "immigration consequences" of her plea, and in particular, did not inform her that pleading guilty to a second controlled substance offense would be considered an "aggravated felony" under federal immigration law and affect her eligibility for SIJ status.

In general, "[a]n applicant's live, sworn testimony," including testimony presented in affidavit form, "is a sufficient basis for upholding a decision to grant relief in [a] habeas proceeding because the trial judge may believe any or all of a witness's testimony." *Guerrero*, 400 S.W.3d at 583. The State, however, seeks to characterize Quiroz Macedo's affidavit as being a "post hoc" and "uncorroborated" affidavit, upon which the trial court was not entitled to rely in considering her IAC claim. We agree with the State that a defendant's uncorroborated testimony about his counsel's errors is generally insufficient to establish ineffective assistance of counsel.[13] But here, the record contains sufficient corroborating evidence to support the trial court's finding that Watson failed to inform Quiroz Macedo of the clear and succinct immigration consequences of her plea as required by *Padilla*.

As set forth above, Watson averred in his affidavit that he had been practicing criminal law

---

[13] *See Arreola v. State*, 207 S.W.3d 387, 391 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (a "defendant's uncorroborated testimony that he was misinformed by counsel is not sufficient to show that his plea was involuntary") (citing *Fimberg v. State*, 922 S.W.2d 205, 208 (Tex. App.—Houston [1st Dist.] 1996, pet. ref'd)); *see also Paschal v. State*, No. 02-20-00073-CR, 2021 WL 3795955, at *2 (Tex. App.—Fort Worth Aug. 26, 2021, no pet.) (mem. op., not designated for publication) (defendant's uncorroborated testimony that his counsel did not inform him of the range of punishment was insufficient to support his IAC claim); *Brim v. State*, No. 02-16-00053-CR, 2016 WL 6803187, at *3 (Tex. App.—Fort Worth Nov. 17, 2016, pet. ref'd) (mem. op., not designated for publication) (defendant's "uncorroborated after-the-fact allegations in his affidavit" that his attorney did not inform him of the consequences of his plea were "not sufficient to rebut the prima-facie showing of the voluntariness of his plea or to overcome the presumption that counsel's conduct was not deficient").

for only five or six months when he represented Quiroz Macedo, and during that time, he "never consulted with immigration attorneys about specific immigration consequences." While Watson was not under a duty to consult with an immigration attorney, the Court of Criminal Appeals has stated this is the preferred practice under such circumstances when a criminal law attorney who has the duty to advise his client on the immigration consequences of his or her plea has no expertise in immigration law. *Ex parte Aguilar*, 537 S.W.3d 122, 127–28 (Tex. Crim. App. 2017) (recognizing that because "[c]riminal law attorneys are generally not knowledgeable of specialized immigration law and may not understand the effect of a criminal conviction on a noncitizen [the court] anticipate[s] and expect[s], but do[es] not demand, that criminal law attorneys will rely on their immigration-law counterparts when representing noncitizens").

More importantly, however, Watson acknowledged in his affidavit that he "[had no] experience with immigration law and never practiced immigration law." The trial court could have reasonably determined that because Watson had no independent knowledge of immigration law and did not consult with an immigration attorney, he would not have had the knowledge to inform Quiroz Macedo of the clear and succinct immigration consequences of her plea, and that he therefore failed to do so. And as discussed above, the written record of the proceedings demonstrates, at most, Watson only warned Quiroz Macedo that her plea "may result in deportation."

When faced with substantially similar evidence, our sister court in Houston affirmed the trial court's finding that counsel's representation was deficient where he represented a noncitizen defendant who pled guilty to a Class A misdemeanor charge of possession of a controlled substance of less than 28 grams without informing him the plea would subject him to mandatory removal proceedings. *Ex parte Huynh*, 2022 WL 210137, at *7–8. In that case, the defendant filed a habeas

30

petition, submitting his own affidavit averring that his attorney never advised him that his plea would result in mandatory deportation. *Id*. at *2. In addition, his plea counsel testified that although he could not recall the exact advice he provided to the defendant, his standard practice was to provide a noncitizen defendant with only a general warning that his plea could result in "potential immigration consequences," and that he should consult with an immigration specialist for more specific information relating to the immigration consequences of his plea. *Id.* at 3–4. As in the present case, the record contained plea documents that the defendant signed, acknowledging that he was aware that a plea of guilty for a non-U.S. citizen may result in deportation or denial of naturalization. *Id*. at *1 n.5. The court concluded that this evidence, at best, established the defendant was provided with only general information that his plea might result in deportation; and it found that merely providing this general information was insufficient to satisfy the requirements of *Padilla*, given the clear and succinct immigration consequences of pleading to a controlled substance offense and the corresponding requirement for counsel to give the defendant "clear and accurate advice regarding the 'presumptively mandatory' deportation consequence of his guilty plea." *Id*. at *7–8 (citing *Ex parte Torres*, 483 S.W.3d at 44).

We similarly conclude that the record before us supports the trial court's findings that Watson failed to provide Quiroz Macedo with clear and accurate advice regarding the presumptively mandatory deportation consequence of her plea as required by *Padilla,* and his performance was therefore deficient under the first prong of the *Strickland* test.

F.    **The trial court's finding of prejudice was supported by the record**

Having found the first prong of the *Strickland* test was met, we turn to the second prong, i.e., whether Quiroz Macedo was prejudiced by her counsel's deficient performance. To establish prejudice, Quiroz Macedo was required to show there was "a reasonable probability that counsel's

31

errors affected the outcome of the plea proceedings, in the sense that, but for counsel's errors, [she] would have rejected the plea bargain and instead pursued a trial." *Ex parte Torres*, 483 S.W.3d at 46 (citations omitted). Stated otherwise, she was required to "convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Id.* at 48 (quoting *Padilla*, 559 U.S. at 372).

The State contends the trial court abused its discretion in finding Quiroz Macedo was prejudiced by her counsel's failure to properly inform her of the mandatory immigration consequences of her plea, again finding it significant that Quiroz Macedo was already subject to "deportation" because of her illegal entry into the country as a child. And the State asserts that under such circumstances, a rational person would not have rejected the State's plea offer of a reduced sentence given the "speculative" nature of receiving discretionary or equitable relief from deportation, and the low odds of receiving such relief. In other words, the State appears to be contending that a rational person would not have risked going to trial and facing a longer potential jail sentence based on the slight chance of being able to avoid removal. We disagree.

In addressing the prejudice requirement, courts have considered various non-dispositive factors, such as "the evidence supporting an applicant's assertions, the likelihood of his success at trial, the risks the applicant would have faced at trial, the benefits received from the plea bargain, and the trial court's admonishments." *Ex parte Torres*, 483 S.W.3d at 48 (citing *United States v. Kayode,* 777 F.3d 719, 725 (5th Cir. 2014)); *see also Ex parte Aguilera*, 540 S.W.3d 239, 247 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (recognizing same); *Simon*, 2018 WL 3468688, at *6 (same). But as the Texas Court of Criminal Appeals has observed, "to show that a decision to reject the plea bargain would have been rational under the circumstances, it is not dispositive that an applicant show that he would have received a more favorable disposition had he gone to trial,"

or that he likely would have been acquitted had he gone to trial. *Ex Parte Torres*, 483 S.W.3d at 48 (citing *United States v. Orocio,* 645 F.3d 630, 643 (3d Cir. 2011) (recognizing that "the Supreme Court requires only that a defendant could have rationally gone to trial in the first place, and it has never required an affirmative demonstration of likely acquittal"; "a rational decision not to plead guilty does not focus solely on whether a defendant would have been found guilty at trial")); *see also Lee*, 582 U.S. at 371 ("When a defendant alleges his counsel's deficient performance led him to accept a guilty plea rather than go to trial, we do not ask whether, had he gone to trial, the result of that trial 'would have been different' than the result of the plea bargain.").[14]

As both the U.S. Supreme Court and the Texas Court of Criminal Appeals have recognized, "an alien defendant might rationally be more concerned with removal than with a term of imprisonment." *Ex Parte Torres*, 483 S.W.3d at 48 (citing *Padilla,* 559 U.S. at 368 ("We too have previously recognized that preserving the client's right to remain in the United States may be more important to the [defendant] than any potential jail sentence.") (citations omitted)). Stated otherwise, given the fact that deportation is "a particularly severe penalty" and is "an integral part—indeed, sometimes the most important part—of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes," the Supreme Court has recognized that "[p]reserving the client's right to remain in the United States may be more important to the client than any potential jail sentence." *Padilla,* 559 U.S. at 368 (internal quotation marks omitted).

---

[14] In *Lee*, the Court further rejected the State's argument that it should apply a "presumption of regularity" in determining whether a defendant was prejudiced by his counsel's deficient performance. *Lee v. United States*, 582 U.S. 357, 364–65 (2017). As the Court recognized, although there is a "strong presumption of reliability to judicial proceedings," a plea proceeding is not considered a "judicial proceeding," but rather a "forfeiture of a proceeding itself." *Id.* at 364. Therefore, the Court held that it could not accord "any such presumption 'to judicial proceedings that never took place.'" *Id.* (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 482–83 (2000)). Instead, the Court held that the issue of whether a defendant was prejudiced by his counsel's deficient performance in a plea proceeding is centered on whether he was prejudiced by the "denial of the entire judicial proceeding . . . to which he had a right." *Id.* (quoting *Flores-Ortega*, 528 U.S. at 483).

Thus, a defendant may rationally decide to reject a plea to avoid removal from the country, and take his chances at trial, despite the high probability that he would be convicted at trial and potentially face an even longer jail or prison sentence. *See Lee,* 582 U.S. at 368 (recognizing that when "asking what an individual defendant would have done, the possibility of even a highly improbable result may be pertinent to the extent it would have affected his decisionmaking").

And as the Court of Criminal Appeals has repeatedly recognized, an appellate court must give proper deference to a trial court's determination of whether a defendant was prejudiced by her counsel's ineffective representation of her, regardless of how the trial court ruled on that issue. *See Ex parte Torres,* 483 S.W.3d at 46 (court of appeals erred "by failing to defer to the habeas court's implicit fact findings that appellant's claims lacked credibility and that appellant failed to plead or prove that, under the circumstances, he would have rejected the plea bargain and proceeded to trial had he been properly advised, or that it would have been rational for him to do so"); *Hradek*, 2024 WL 5059142, at *9 (finding that court of appeals erred by failing to give proper deference to trial court's finding that defendant was prejudiced by her attorney's deficient performance at trial).

Here, giving proper deference to the trial court, as we must, and applying the factors set forth above, we conclude the record supports the court's finding that a person in Quiroz Macedo's circumstances could have rationally rejected the plea bargain and proceeded to trial if she had been properly advised of the clear and succinct immigration consequences she faced.

The benefits Quiroz Macedo received from entering her plea were negligible in comparison to the undeniably serious and permanent consequence of being subject to mandatory removal. As set forth above, Quiroz Macedo received a 40-day jail sentence pursuant to her guilty plea to the possession charge. But the maximum jail sentence she could have received from being found guilty

34

at trial of a Class A misdemeanor was only one year. *See* Tex. Penal Code Ann. § 12.21 (a person "adjudged guilty of a Class A misdemeanor shall be punished by: (1) a fine not to exceed $4,000; (2) confinement in jail for a term not to exceed one year; or (3) both such fine and confinement").[15] Accordingly, Quiroz Macedo would have, at most, been subjected to an additional 315 days in jail if she had gone to trial and been convicted, and the trial court could have reasonably determined that she would have been willing to risk those additional days in jail to avoid the prospect of mandatory removal. *See, e.g.*, *Lee*, 582 U.S. at 366–67 (recognizing that "a defendant with no realistic defense to a charge carrying a 20–year sentence may nevertheless choose trial, if the prosecution's plea offer is 18 years"); *see also Ex parte Leal*, 427 S.W.3d at 462–64 (recognizing that the trial court could have found that it would have been rational for a defendant to reject a plea offer that required him to serve 100 days in jail, where the maximum sentence was 180 days, in light of the "particularly severe consequence" of deportation).

While the State maintains that it was almost inevitable that Quiroz Macedo would have been found guilty given her admission to the arresting officer that she had alprazolam in her purse, the trial court was entitled to determine that—despite this possibility—a person in Quiroz Macedo's circumstances, who had been living in the United States since childhood with her sister, with no apparent ties to Mexico, would have preferred to prepare a defense and take her chances of being convicted at trial, rather than plead guilty and face mandatory removal from the country in which she had grown up. *See Lee*, 582 U.S. at 370 (where defendant had been living in the United States for nearly three decades and had no ties to his country of origin, the trial court could

---

[15] The record reflects Quiroz Macedo was under arrest for a Class C, fine-only theft offense at the time she was charged with the controlled substance offense, but it is unclear whether she was charged with the theft or whether the theft charge was dismissed pursuant to her plea bargain agreement with the State. But because she would not have faced any jail time as the result of that offense, even if the State agreed to drop the theft charge in exchange for Quiroz Macedo's plea to the controlled substance offense, our conclusion remains the same.

have concluded that he would have preferred to take his chances at trial rather than plead guilty and face mandatory deportation); s*ee also Salazar v. State*, 361 S.W.3d 99, 103 (Tex. App.—Eastland 2011, no pet.) (determining it would have been rational for a defendant facing mandatory deportation to "take the chance on acquittal at the risk of a maximum of two years state jail time and a fine of $10,000 rather than enter a guilty plea that would result in certain deportation, separating [the defendant] from his family and the opportunities that come from being a legal resident of the United States").

Finally, the State finds it significant that Quiroz Macedo had "a prior conviction" for attempted possession of a controlled substance offense due to her plea in the 2009 proceeding and was already subject to mandatory removal because of that plea. According to the State, because she was already subject to mandatory removal as the result of the 2009 plea, a rational person in Quiroz Macedo's "shoes" would not have rejected the plea offer in the 2010 case, regardless of whether she knew the consequences of that plea or not. *See Ex parte Martinez*, No. 03-15-00334-CR, 2016 WL 4628056, at *3 (Tex. App.—Austin Aug. 31, 2016, no pet.) (mem. op., not designated for publication) ("The test is objective; it turns on what a reasonable person in the defendant's shoes would do.") (quoting *Ex parte Ali*, 368 S.W.3d 827, 835 (Tex. App.—Austin 2012, pet. ref'd)). While we might accept this argument if there was evidence that Quiroz Macedo knew at the time that her 2009 plea subjected her to mandatory removal, there is no such evidence in the record. To the contrary, the record of the plea proceedings in her 2009 case reflect only that she was informed that her plea "may result" in deportation. And in fact it appears her attorney may have affirmatively misinformed Quiroz Macedo of the immigration consequences of her plea, based on the Travis County district court's 2020 order finding her plea involuntary and granting her motion for a new trial.

In the absence of any evidence that Quiroz Macedo was aware at the time she entered her 2010 plea that her 2009 plea would subject her to mandatory removal, we cannot say it would have been irrational for a person in her position to reject the plea offer in her 2010 case and take her chances at trial to avoid removal. *See Guerrero*, 400 S.W.3d at 589 n.56 (recognizing that in determining whether a defendant could have rationally refused a plea bargain offer, "what matters is the state of the law and the state of appellee's knowledge at the time he entered his plea, not events that have occurred since then"). To hold otherwise would be to allow two wrongs to make a right. This we decline to do.

Accordingly, we conclude the record supports the trial court's finding that Quiroz Macedo was prejudiced by Watson's failure to inform her of the mandatory removal consequences of her plea and that she was therefore denied her constitutional right to the effective assistance of counsel in entering her 2010 plea. We defer to that finding.

The State's Issue One is overruled.

## V. THE STATE'S LACHES DEFENSE

In Issue Two, the State contends the trial court abused its discretion in rejecting its claim that Quiroz Macedo was barred by the doctrine of laches from bringing her habeas petition. Based on the record before it, however, we conclude the trial court could have reasonably rejected the State's laches claim.

### A. Applicable law and standard of review

"[T]he writ of habeas corpus is an extraordinary remedy, any grant of which must be underscored by elements of fairness and equity." *Ex parte Smith*, 444 S.W.3d 661, 666 (Tex. Crim. App. 2014) (citing *Ex parte Perez*, 398 S.W.3d 206, 216 (Tex. Crim. App. 2013)). Because "habeas is governed by the elements of equity and fairness . . . those elements require a consideration of

unreasonable delay," and therefore a trial court "may consider *sua sponte* whether laches should bar an applicant's habeas claim." *Ex parte Bowman*, 447 S.W.3d 887, 888 (Tex. Crim. App. 2014); *Pastenes v. State*, No. 03-16-00102-CR, 2017 WL 2928112, at *2 (Tex. App.—Austin July 6, 2017, no pet.) (mem. op., not designated for publication) (recognizing common-law doctrine of laches applies to habeas applications).

But the Court of Criminal Appeals has consistently held that delay alone is insufficient to establish that laches bars a defendant from bringing a habeas petition. *See Ex parte Smith*, 444 S.W.3d at 667 (recognizing "equity does not require that an applicant be barred from relief by mere delay alone"). Instead, it has recognized that in determining whether laches applies, a court should consider a variety of factors, including "the length of applicant's delay in requesting equitable relief, the reasons for the delay, and the degree and type of prejudice borne by the State resulting from applicant's delay." *Id.* at 666–67. But as the court observed, "[n]o single factor is necessary or sufficient" to establish laches. *See Ex parte Perez*, 398 S.W.3d at 217 (quoting *Dragoo v. State*, 96 S.W.3d 308, 314 (Tex. Crim. App. 2003)). Instead, "courts must 'engage in a difficult and sensitive balancing process' that takes into account the parties' overall conduct." *Id.* (quoting *Zamorano v. State*, 84 S.W.3d 643, 648 (Tex. Crim. App. 2002)).

The court has further recognized that a delay in bringing a habeas application "may be excused when the record shows that (1) an applicant's delay was not unreasonable because it was due to a justifiable excuse or excusable neglect; (2) the State would not be materially prejudiced as a result of the delay; or (3) the applicant is entitled to equitable relief for other compelling reasons, such as new evidence that shows he is actually innocent of the offense." *Ex parte Smith*, 444 S.W.3d at 667 (citing *Ex parte Perez*, 398 S.W.3d at 218).

Given the interplay of these various factors, the Court of Criminal Appeals has held a court must consider the issue of laches on a "sliding scale" by which "the extent of the prejudice the State must show bears an inverse relationship to the length of the applicant's delay." *Ex parte Perez*, 398 S.W.3d at 217. As the court has explained, "[t]he rationale for this sliding-scale approach is based on the common-sense understanding that the longer a case has been delayed, the more likely it is that the reliability of a retrial has been compromised." *Id.* at 218. And although the Court of Criminal Appeals has declined to adopt a presumption of prejudice to the State after a specific amount of time, it has held that delays of more than five years may generally be considered unreasonable in the absence of any justification for the delay. *Id.* at 216 n.12; *see also Pastenes*, 2017 WL 2928112, at *3 (recognizing same).

## B. Analysis

### (1) Did Quiroz Macedo unreasonably delay in bringing her habeas petition?

The question of whether Quiroz Macedo unreasonably delayed in bringing her habeas petition centers on when she learned that her plea subjected her to mandatory removal. As set forth above, we have already concluded that she was not informed of such at her 2010 plea proceedings. And in her pleadings, Quiroz Macedo alleged that she was not aware of the consequences of her plea until March 2020, when the government scheduled a hearing for her removal.

The State, however, correctly points out that her unsworn pleadings do not constitute evidence. *See Ex parte Castaneda*, No. 03-17-00336-CR, 2018 WL 1023893, at *5 (Tex. App.—Austin Feb. 23, 2018, no pet.) (mem. op., not designated for publication) (recognizing arguments of counsel in unsworn pleadings "do not constitute competent evidence before the habeas court"); *see also Guerrero*, 400 S.W.3d at 584–86 (recognizing that trial court could not rely on unsworn statements by counsel in determining defendant's right to habeas relief). But there is in fact

evidence in the record from which the trial court could have determined that Quiroz Macedo was not aware of the immigration consequences of her plea until June of 2020 (if not March of 2020). As Espinosa explained in his affidavit, Quiroz Macedo had a preliminary immigration hearing following her 2010 plea—which is substantiated by the written documents pertaining to her ICE detainer—and a second hearing was not scheduled until June 2020. In his affidavit, Espinosa also opined that because her second immigration hearing was scheduled for June 2020, "Quiroz Macedo has not been at risk for deportation until recently." The State points out that this is not an entirely accurate statement of the law, as she was always at "risk for deportation," given her illegal entry into the country. But the trial court did not need to rely on this statement in determining Quiroz Macedo had a reasonable justification for the delay in bringing her habeas petition, given the lack of any evidence in the record that she was aware that her 2010 plea subjected her to mandatory removal until the second hearing was scheduled.

As set forth above, the record reflects that after her first immigration hearing in 2010, Quiroz Macedo, who was only 17 years old at the time, was "released" to a family member. There is nothing in the record to suggest the government scheduled any other immigration proceedings in the interim or provided her with any other notices regarding her immigration status until her second immigration hearing was set ten years later. Under these circumstances, the trial court could have reasonably determined Quiroz Macedo was unaware that her plea had subjected her to mandatory deportation consequences until that time. To the contrary, because the government did not deport her at the time—despite being aware of her conviction—Quiroz Macedo could have reasonably believed that her conviction did not in fact render her subject to mandatory removal.

In reaching this conclusion, we note that the lack of any evidence in the record that Quiroz Macedo was aware of the consequences of her plea until she was faced with removal proceedings

in 2020 is critical in the context of *Padilla* and its progeny. The very holding in *Padilla* was directed at ensuring that a defendant was made aware of the immigration consequences of his or her plea, given the critical nature of such information. *See Padilla*, 559 U.S. at 373–74 (recognizing "[t]he severity of deportation [which is] 'the equivalent of banishment or exile' . . . only underscores how critical it is for counsel to inform her noncitizen client that he faces a risk of deportation"). We fail to see how a defendant who was not informed of those consequences at her plea hearing could be said to have unreasonably delayed in filing a challenge to her plea absent any evidence that she was advised of those consequences in the interim.

The State, however, contends that even if Quiroz Macedo was unaware of the immigration consequences of her plea in 2010, the trial court should have found she became aware of those consequences when, as Espinosa averred in his affidavit, his firm "began to work with Ms. Quiroz Macedo around April 2014." According to the State, Espinosa's affidavit with respect to this timeline was sufficient to establish Quiroz Macedo had "knowledge and awareness that her conviction could have deportation consequences" at that time, and she therefore should have pursued relief earlier. While this may have been one possible inference the trial court could have drawn from Espinosa's affidavit, it is not the only one. Significantly, there is nothing in Espinosa's affidavit to indicate how closely he worked with Quiroz Macedo in 2014, or whether they discussed her prior conviction in Texas.[16] There is also nothing in the record to indicate Espinosa, or anyone else at his firm, advised Quiroz Macedo she should consider filing a habeas petition prior to 2020 to try to vacate her conviction. Therefore, regardless of when she began consulting with Espinosa's firm, the trial court could have reasonably determined that she remained unaware

---

[16] It is unclear how closely Quiroz Macedo worked with Espinosa or his firm prior to the filing of the 2020 removal proceedings. In particular, we note that Espinosa's affidavit was notarized in Ohio, while Quiroz Macedo's affidavit was notarized in Texas.

that her 2010 plea subjected her to mandatory removal until the government scheduled her immigration hearing in 2020, after which she promptly filed her habeas petition.

### (2) Did the State establish that it was prejudiced by any delay?

Moreover, even if the trial court had determined Quiroz Macedo was aware in 2014 (or any time prior to 2020) that she had not been properly informed of the immigration consequences of her plea, the record supports the trial court's finding that the State failed to establish, by a preponderance of the evidence, it was prejudiced by the delay in bringing her petition.

In arguing that the trial court erred in finding that it was not prejudiced by the almost ten-year delay in bringing the habeas petition, the State first complains that the trial court did not expressly state in its order that it was applying the required "sliding scale" analysis to its findings on laches. Despite the trial court's failure to do so, we may assume for purposes of appeal that the trial court applied the correct analysis in rejecting the State's laches claim, and we may therefore uphold its ruling on that basis if it is supported by the record. *See generally Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003) ("The court of appeals was obligated to uphold the trial court's ruling on appellant's motion to suppress if that ruling was supported by the record and was correct under any theory of law applicable to the case . . . even if the trial court gave the wrong reason for its ruling.") (citing *Romero v. State*, 800 S.W.2d 539, 543–44 (Tex. Crim. App. 1990) (upholding trial court's decision to suppress defendant's statement even though the trial judge did not specify under which theory he found it inadmissible)). Here, we conclude that the trial court did not abuse its discretion in finding that the State failed to establish prejudice under a sliding scale analysis.

As it did in the trial court, the State makes a general argument that it was prejudiced by the passage of time in its ability to respond to the habeas petition and in its ability to prosecute Quiroz

Macedo's case due to: (1) the loss of pertinent records, which were lost or destroyed due to applicable records retention schedules; and (2) the "diminished memories" of the individuals involved in the plea proceedings and those who would be witnesses at her trial. The State correctly notes these can be factors for a court to consider in determining prejudice in a laches analysis. *See, e.g., Ex parte Smith*, 444 S.W.3d at 666 (when determining whether laches applies, courts should consider "the trial participants' faded memories and the diminished availability of evidence"); *Ex parte Perez*, 398 S.W.3d at 209 (recognizing it is reasonable to expect that the "faded memories of the witnesses will hamper the State's ability to present a case."). But in considering these factors, we conclude that the trial court could have reasonably determined that the State did not establish it was prejudiced by any delay in bringing the habeas petition.

The only evidence the State submitted on the issue of prejudice was the above-described affidavit from an administrator at the Williamson County Attorney's Office, wherein she averred that the Office only retains the "physical file" of a case, which includes "media evidence," for seven years after a defendant is convicted. The administrator acknowledged that the Office currently keeps an "electronic file of all records, including but not limited to intake documents, offense reports, paper evidence, charging documents, work product notes, etc." She then averred that "in the past, including 2010, the Office did not maintain any document or record received from any outside source in electronic files[,]" and that "the Office maintained documents received, including but not limited to intake documents, offense reports, paper evidence, media evidence, etc. in physical files."

We cannot discern from the record what, if anything, remains in the State's "electronic file" in Quiroz Macedo's case, or conversely what is missing from the file that the State might need to successfully prosecute Quiroz Macedo. As set forth above, the trial court record contains

43

numerous documents pertaining to Quiroz Macedo's case, including the arresting officer's probable cause affidavit, in which he stated that Quiroz Macedo admitted she illegally possessed drugs (later found to be alprazolam) in her purse. And significantly, although the State asked the trial court to consider in general whether a delay of over nine years in bringing a habeas petition "compromised the reliability of a retrial and the diminished memories of trial participants[,]" there is no evidence to support a finding that the arresting officer would not be able to recall the events surrounding Quiroz Macedo's arrest, her alleged confession, or his search of her purse and his testing of the contents therein. Nor is there any evidence that any other individuals, including the prosecutors who may have been assigned to Quiroz Macedo's case, had no independent recollection of her case. In the absence of any such evidence, the trial court was not required to presume that the State was prejudiced in its ability to try Quiroz Macedo's case.

In addition, there is no evidence that the State was prejudiced in responding to Quiroz Macedo's habeas petition due to the lack of a reporter's record of the plea hearing. According to the State, the record was necessary to establish what occurred during the plea hearing, to either confirm or contradict Quiroz Macedo's claim that she was not informed of the immigration consequences of her plea. But again, this overlooks the fact that there may have been individuals present at the hearing who could have attested to what occurred at that proceeding. While the State makes a general allegation that the passage of time may have diminished the memories of those present at the plea hearing, there is no evidence to support its allegation. In particular, there are no affidavits from the prosecutor—or anyone else who was present at the hearing —averring that they could not recall what occurred at that time. *Cf. Ex parte Vasquez*, 499 S.W.3d 602, 614 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) (upholding trial court's decision to deny habeas relief on the ground of laches where the State presented evidence that the defendant's case file had been

44

destroyed, together with affidavits from those present at the defendant's plea hearing, including defense counsel and two prosecutors, who averred that they had no independent recollection of what occurred at the hearing). In the absence of any such evidence, the trial court was not required to presume that the passage of time prejudiced the State in its ability to respond to the habeas petition or in its ability to try Quiroz Macedo's case at some future date.

In sum, we note that because "laches is largely governed by equitable principles," and trial courts enjoy a broad discretion in considering the issue, we cannot say, in light of the record before us, that the trial court abused its discretion in rejecting the State's laches defense. *See Ex parte Osvaldo*, 534 S.W.3d 607, 625 (Tex. App.—Corpus Christi 2017) (finding no abuse of discretion in rejecting the State's laches defense where over ten years passed between the time the defendant entered his plea in 2002 and he moved for habeas relief), *aff'd sub nom. Ex parte Garcia*, 547 S.W.3d 228 (Tex. Crim. App. 2018)..[17]

The State's Issue Two is overruled.

## VI. CONCLUSION

Having found that the trial court did not abuse its discretion in granting Quiroz Macedo's habeas application, we affirm the trial court's ruling.

LISA J. SOTO, Justice

Before Alley, C.J., Palafox and Soto, JJ., Rodriguez, C.J., (Senior Judge, Ret.) and Gabriel, J., (Senior Judge, Ret.)
Alley, C.J., and Gabriel, J., dissenting without written opinion

December 30, 2024

---

[17] We further note that although the Court of Criminal Appeals did not address the issue of laches in its holding in *Guerrero*, it nevertheless considered the merits of a defendant's habeas petition even though the defendant entered his plea to a controlled substance offense in 1998 and did not bring his habeas petition until over ten years later when he was faced with removal proceedings. *State v. Guerrero*, 400 S.W.3d 576, 581 (Tex. Crim. App. 2013).

(Do Not Publish)